**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCENIC AMERICA, INC.,

     Plaintiff,

          v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, RAY LAHOOD,
FEDERAL HIGHWAY
ADMINISTRATION, and VICTOR
MENDEZ,

     Defendants,

     and

OUTDOOR ADVERTISING
ASSOCIATION OF AMERICA, INC.,

     Intervenor-Defendant.

Civil Action No. 13-93 (JEB)

## MEMORANDUM OPINION

In 2007, the Federal Highway Administration issued a "Guidance" that paved the way for the construction of digital billboards along the nation's highways. Plaintiff Scenic America, a group dedicated to preserving the country's visual beauty, wants to put the brakes on that decision.

Historically, the FHWA believed that digital billboards violated key language in federal-state agreements related to the Interstate Highway System. But the agency recently shifted gears and gave the green light to its Division Offices by providing a new interpretation of that language that would permit digital billboards in certain circumstances. Scenic America says that this decision bypassed the mandatory notice-and-comment rulemaking route and also collided

head-on with important federal highway laws. The group cautions that the bright, moving lights on digital billboards tow a load of safety and aesthetic concerns – that they threaten to turn Route 66 into the Road to Perdition.

Now the case is at a crossroads. Defendants are the Department of Transportation, the Federal Highway Administration, the Secretary of Transportation, and the Federal Highway Administrator, and in the passenger seat is an Intervenor, the Outdoor Advertising Association of America. Both have filed Motions to Dismiss, throwing up roadblocks to Scenic America's suit. First, they claim Scenic America lacks standing to sue because the group is driven by mere ideological objections to the Guidance, not by any actual harm. Second, they say that the Court must steer clear because the Guidance is not final agency action subject to judicial review.

Although both arguments present difficult and close questions, the Court concludes that neither gives cause to end this case by fiat. Scenic America has standing to challenge the Guidance because its case is fueled by concrete harm to the organization's programs. And because the Guidance is the end of the road for FHWA decisionmaking on this matter, it constitutes final agency action. The Court accordingly declines to take either exit proposed by Defendants and Intervenor and orders that the case should speed on to its next turn.

## I.    Background

Punning thankfully complete, the Court begins with the Highway Beautification Act, which Congress enacted in 1965 to govern "the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to" the interstate highway system. 23 U.S.C. § 131(a). Among other things, the Act requires that each State negotiate a federal-state agreement (FSA) with the Secretary of Transportation in order to set out rules for the "size, lighting[,] and spacing" of billboards in the State that come within 660 feet of the nation's highways. Id.,

§131(d). All fifty States have done so. See Compl., ¶ 31; e.g., Ark. Code Ann. § 27-74-101 *et seq.* (The Arkansas Highway Beautification Act); Or. Rev. Stat. § 377.700 *et seq.* (The Oregon Motorist Information Act); Ariz. Rev. Stat. § 28-7901 *et seq.* (The Arizona Highway Beautification Act). The Act also requires that States obtain approval from the FHWA before they make any changes to their outdoor-advertising regulations, in part to ensure that the regulations comply with their FSAs. See 23 C.F.R. § 750.705(j). A State that fails to ensure compliance with its FSA faces a 10% cut in its allocated federal highway funds. See id., § 750.705(b); 23 U.S.C. § 131(b).

This case concerns a Guidance document issued by the FHWA to its Division Offices. The Guidance interpreted certain FSA language to permit States to allow the construction of digital billboards along interstate highways. Digital billboards use light-emitting diodes that switch on and off in order to depict action, motion, light, or color changes. See Compl., ¶¶ 36-38. The majority of FSAs prohibit billboards with dynamic lighting; a typical provision, contained in 30 FSAs, bars "[s]igns which contain, include, or are illuminated by any flashing, intermittent, or moving light or lights." Id., ¶¶ 33 & 34. Because most FSAs were written in the 1960s and 1970s, see id., ¶ 31, they do not make clear whether more modern technologies, such as digital billboards, fall within their ban. Before 2007, the FHWA had "historically considered" FSA references to "flashing, intermittent, or moving lights" to forbid digital billboards, see Opp., Exh. 3 (FHWA Manual) at 13, although several Division Offices had approved State proposals to allow them. See Def. Mot., Exh. 1 (FHWA, DOT, Memorandum: Guidance on Off-Premise Changeable Message Signs (September 25, 2007)) at 1.

In 2007, the FHWA sent a memorandum entitled "Guidance on Off-Premise Changeable Message Signs" to its regional Division Offices. See id. The Guidance instructed that Offices

weighing States' proposals to permit digital billboards in their territories should approve them so long as they (1) complied with the States' FSAs and (2) considered certain public safety requirements.  See id. at 1.  The Guidance stressed, in bolded typeface: "Proposed laws, regulations, and procedures that would allow permitting [digital billboards] subject to acceptable criteria (as described below) do not violate a prohibition against 'intermittent' or 'flashing' or 'moving' lights as those terms are used in the various FSAs that have been entered into during the 1960s and 1970s."  Id. (emphasis added).  The Guidance went on to define the "acceptable criteria" that State proposals should contain, including regulations for the duration of the billboards' messages, the transition times between messages, the billboards' brightness, the spacing between the signs, and the locations of the signs.  See id. at 3.  Since the FHWA issued the Guidance in 2007, States like Florida and Minnesota have begun to permit the construction of digital billboards, and the signs have proliferated along America's roadways, rising from 500 in 2006 to approximately 4,000 today.  See Opp. at 7, 10-11.

Scenic America is a nonprofit membership organization that seeks to "preserve and improve the visual character of America's communities and countryside."  Compl., ¶ 7.  Although it does not mention why it has waited six years to do so, the group now asks this Court to vacate the 2007 Guidance on the ground that it was issued in violation of the Administrative Procedure Act and the Highway Beautification Act.   Scenic America highlights three specific problems it sees with the Guidance.  First, it is a legislative rule promulgated without the notice-and-comment procedure required by the APA.  See 5 U.S.C. § 553.  Second, it creates new lighting standards for billboards without "agreement between the several States and the Secretary [of Transportation]," as required by the HBA.  See 23 U.S.C. § 131(d).  And finally, it

establishes lighting standards for billboards that are inconsistent with "customary use," another violation of the HBA.  See id.

Defendants – the Department of Transportation, the Federal Highway Administration, the Secretary of Transportation, and the Federal Highway Administrator – along with an Intervenor – Outdoor Advertising Association of America – have now moved to dismiss Scenic America's Complaint.

## II.     Legal Standard

In evaluating Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), the Court must "treat the complaint's factual allegations as true … and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  This standard governs the Court's considerations of Defendants' and Intervenor's Motions under both Rules 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.");  Walker v. Jones, 733 F.2d 923, 925–26 (D.C. Cir. 1984) (same).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case—a dismissal under Rule 12(b)(1) on ripeness grounds—the court may consider materials outside the pleadings."); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.    Analysis

Defendants and Intervenor both seek dismissal of Scenic America's Complaint on two grounds: first, that Plaintiff lacks standing to challenge the 2007 Guidance, and second, that the Guidance is not a final agency action subject to judicial review. The standing requirement is a matter of Article III jurisdiction, and so the Court would typically begin with that question. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-101 (1998). Defendants, however, style their final-agency-action argument as a matter of the federal government's sovereign immunity, see Def. Mot. at 16, which would also make it jurisdictional in nature. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). The Court nevertheless believes that this issue is better understood, as Intervenor frames it, as a Rule 12(b)(6) question of whether Scenic America has stated a claim

upon which relief can be granted, a non-jurisdictional issue.  <u>See</u> Int. Mot. at 18.  Indeed, this

Circuit's precedent makes clear that the final-agency-action requirement is not jurisdictional, <u>see</u>

<u>Trudeau v. Federal Trade Comm'n</u>, 456 F.3d 178, 185 (D.C. Cir. 2006), which suggests that

sovereign immunity cannot be the principle that bars plaintiffs from challenging non-final

agency action.  The Court, accordingly, will treat the finality inquiry as a Rule 12(b)(6) issue,

rather than a 12(b)(1) jurisdictional matter.  As a result, it will address finality only after

determining whether Scenic America has standing to sue.

    A.  <u>Standing</u>

Not every disagreement merits a lawsuit.  Federal courts decide only "cases or

controversies," a phrase given meaning by the doctrine of "standing."  <u>See</u> <u>Whitmore v.</u>

<u>Arkansas</u>, 495 U.S. 149, 154-55 (1990); U.S. Const. art. III.   To have standing to bring a lawsuit

in federal court, the plaintiff must establish that: (1) he has suffered a concrete and particularized

injury that is actual or imminent, not conjectural or hypothetical; (2) there is a causal relationship

between his injury and the defendant's conduct; and (3) it is likely that a victory in court will

redress his injury.  <u>Lujan</u>, 504 U.S. at 560-61.  As an organizational plaintiff, Scenic America

may have standing to sue both on its own behalf, known as "organizational standing," and also

on its members' behalf, which is called "representational standing."  <u>See</u> <u>Abigail Alliance for</u>

<u>Better Access to Developmental Drugs v. Eschenbach</u>, 469 F.3d 129, 132 (D.C. Cir. 2006).  In

this instance, because Plaintiff has established the former, the Court need not address the latter.

To determine an organization's standing to sue on its own behalf, the same inquiry

applies as it does for an individual: "Has the plaintiff alleged such a personal stake in the

outcome of the controversy as to warrant his invocation of federal-court jurisdiction?"  <u>Havens</u>

<u>Realty Corp v. Coleman</u>, 455 U.S. 363, 378-79 (1982) (internal quotation marks omitted).  Just

like an individual, a group attempting to establish organizational standing to sue must satisfy the three elements of the "irreducible constitutional minimum of standing" mentioned previously. Lujan, 504 U.S. at 560. Defendants and Intervenor contend that Scenic America has failed to meet that constitutional minimum. The Court disagrees.

### 1. *Injury-in-Fact*

To sue on its own behalf, Scenic America must first demonstrate that it has suffered a "concrete and particularized harm." Id.; see also Nat'l Taxpayers' Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995). Plaintiff's Complaint describes three injuries that the 2007 Guidance inflicted on the organization. First, the FHWA's failure to use notice-and-comment rulemaking caused an "ongoing procedural and informational harm to Scenic America … by depriving [it] of an opportunity to influence public policy related to digital billboards and denying [it] access to information [about digital billboards]." Compl., ¶ 13. Second, the 2007 Guidance forced Scenic America "to pursue costly strategies to oppose … [the] proliferation [of digital billboards]." Id., ¶ 16. As a result, Scenic America has had to divert funds from its other scenic-conservation programs, including work on "cellphone tower placement, underground wiring, historic train station restoration, parkland preservation, storefront and landscape improvement, context sensitive road design, and scenic byways." Opp. at 19. Third, Scenic America claims that the Guidance "impaired [the group's] … effectiveness in combating billboard blight." Compl., ¶ 17. While the first of these harms does not rise to the level of injury-in-fact, the second two do.

As to the first harm, the Supreme Court and the D.C. Circuit have made pellucid that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."

Summers v. Earth Island Institute, 555 U.S. 488, 496 (2009); Fund Democracy, LLC v. SEC, 278 F.3d 21, 27 (D.C. Cir. 2002).  That includes the deprivation of the right to participate in notice-and-comment rulemaking – the harm alleged here – which "in and of itself, does not establish an actual injury."  Int'l Bhd. of Teamsters v. TSA, 429 F.3d 1130, 1135 (D.C. Cir. 2005).  Instead, "[i]n order to make out a constitutionally cognizable injury, plaintiffs must demonstrate that the allegedly deficient procedures implicate distinct substantive interests as to which Article III standing requirements are independently satisfied."  Freedom Republicans, Inc. v. Fed. Election Comm'n, 13 F.3d 412, 416 (D.C. Cir. 1994).  The fact that the FHWA may have violated the APA's prescribed notice-and-comment procedures when it promulgated the Guidance does not, standing alone, constitute a "concrete and particularized harm" to Scenic America.  Lujan, 504 U.S. at 560.  As a result, Plaintiff may not establish organizational standing on that basis.

The second two harms do describe substantive injuries to Scenic America, but Defendants and Intervenor maintain that they are still insufficient to bestow organizational standing on the group.  To establish that it has suffered an injury-in-fact, an organizational plaintiff must show a "concrete and demonstrable injury to [its] activities … more than simply a setback to [its] abstract social interests."  Havens Realty, 455 U.S. at 379; see also National Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); American Legal Foundation v. FCC, 808 F.2d 84, 91-92 (D.C. Cir. 1987).  The D.C. Circuit, accordingly, "has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised."  Abigail Alliance, 469 F.3d at 133 (emphasis added).  This distinction is not quite as clear as it appears, however, since the same decision notes that "[f]or standing to be based upon injury to the organization's activities

there must … be a direct conflict between the defendant's conduct and the organization's mission." Id. (emphasis added).

Fortunately, other precedent explains this further and, in fact, is quite generous in defining harm to an organizational plaintiff's "activities." Such a plaintiff is said to suffer an injury-in-fact if it "undert[akes] expenditures in response to, and to counteract, the effects of [a] defendant['s] [challenged conduct]." Equal Rights Center v. Post Properties, Inc., 633 F.3d 1136, 1140 (D.C. Cir. 2011). In Havens Realty Corp. v. Coleman, for example, the Supreme Court held that an organization promoting equality in housing had been injured by a real estate company's discriminatory practices because they had forced the organization "to devote significant resources to identify and counteract the … racially discriminatory … practices" and thus "frustrated the organization's counseling and referral services, with a consequent drain on resources." 455 U.S. at 369, 379; see also Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990). Similarly, the D.C. Circuit has recognized organizational standing where an equal-employment group sued an employment agency for racial discrimination in hiring because the discrimination "might increase the number of people in need of counseling…[and] reduce[] the effectiveness of any given level of [the organization's] outreach efforts." Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994); see also Equal Rights Center, 633 F.3d at 1140-42.

Defendants and Intervenor note, however, that the law is also quite skeptical of alleged organizational injuries related to lobbying and issue advocacy. For instance, in Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152 (D.C. Cir. 2005), an advocacy group claimed standing to challenge Department of Education regulations related to federal oversight of State education standards. The group had suffered "injury to its advocacy," both because the DOE

regulations did not adopt a national assessment methodology, which "forced [the group] to address advocacy issues on an expensive State-by-State basis," and because the regulations "failed to require States to provide for public participation." Id. at 1161-62 & n.4. But the D.C. Circuit held fast the courthouse doors: "This Court has not found standing when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities)." Id. at 1161. The panel distinguished the case from Havens Realty, where the challenged conduct had "perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low- and moderate-income home-seekers…' Here, the only 'service' impaired is pure issue-advocacy – the very type of activity distinguished by Havens." Id. at 1162 (quoting Havens Realty, 455 U.S. at 379).

So on which side of the line does this case fall? On close analysis, it appears that Scenic America has alleged a sufficient injury to challenge the 2007 Guidance. The Guidance harms Plaintiff because its effect is to force the organization to combat an increased number of digital billboards with a concomitant drain on the resources dedicated to other conservation programs. Concrete examples of the activities that Scenic America undertakes to oppose digital billboards include:

- Representation of individuals and groups before local zoning boards to contest the construction of specific digital billboards. See Opp., Exh. 19 (Declaration of Stephanie Kindt), ¶¶ 10, 11;

- Provision of "legal, policy, safety and procedural information" in response to requests from Scenic America members and other interested parties "to help them fight specific signs in their communities." Opp., Exh. 21 (Declaration of Margaret Lloyd), ¶ 11; see also Opp., Exh. 20 (Declaration of Charley Weeth), ¶ 9; Opp., Exh. 22 (Declaration of Mary Tracy), ¶¶ 11, 16;

- Creation and management of websites and email-alert systems related to digital billboards.  <u>See</u> Tracy Decl., ¶ 15;

- Lobbying for local moratoriums on new billboard construction and local ordinances banning digital billboards.  <u>See</u> Lloyd Decl., ¶¶ 12, 16; Weeth Decl., ¶ 15;

- Education of local officials about how to regulate and prohibit digital billboards.  <u>See</u> Lloyd Decl., ¶ 11; Weeth Decl., ¶¶ 8, 15; and

- Coordination of letter-writing and petition campaigns against digital billboards.  <u>See</u> Lloyd Decl., ¶ 12; Weeth Decl., ¶ 15.

While Scenic America could not sue simply on the ground that the Guidance forced the group to spend more on lobbying against digital billboards in more states, <u>see</u> <u>Center for Law and Educ. v. Dep't of Educ.</u>, 396 F.3d at 1162, only some of the above-listed activities can fairly be categorized as the kind of "pure issue-advocacy" that would not suffice to confer organizational standing.  <u>Id.</u>  The group's other anti-billboard efforts – particularly its participation in local zoning board meetings to challenge specific billboards, its sharing of information in response to requests from affected communities, and its management of websites and email-alert systems – are much more like the counseling and referral services provided by the equality organizations that successfully established standing.  <u>See</u> <u>Havens Realty Corp.</u>, 455 U.S. at 369, 379; <u>Spann</u>, 899 F.2d at 27; <u>Fair Emp't Council</u>, 28 F.3d at 1276; <u>Equal Rights Center</u>, 633 F.3d at 1140-42.  With each new state regulation amended in the wake of the 2007 Guidance, Scenic America must spend more resources by, for example, appearing at zoning board meetings to challenge particular digital billboards and educating local communities about the legal, policy, safety, and administrative issues related to the different signs.  That harm constitutes an injury-in-fact.

Defendants and Intervenor offer one last argument against Scenic America's alleged injury by noting that the D.C. Circuit has expressed hostility toward organizational standing premised on the "harm" of having to litigate, or prepare to litigate, against challenged conduct. See Equal Rights Center, 633 F.3d at 1140-41; Fair Emp't Council, 28 F.3d at 1276-77. "Were an association able to gain standing merely by choosing to fight a policy that is contrary to its mission, the courthouse door would be open to all associations." Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc., 498 F. Supp. 2d 187, 192 (D.D.C. 2007). But, as just explained, Scenic America's efforts to combat the construction of digital billboards are not limited to lobbying and litigation. And even if those efforts were purely litigation based, they would be separate lawsuits from the one at hand, not the "self-inflicted" simulacrum of harm that the D.C. Circuit rejected when it dismissed claims of standing founded on the expense of the plaintiff's lawsuit itself. Fair Employment Council, 28 F.3d at 1276-77; see also Equal Rights Center, 633 F.3d at 1140-42.

      2. *Causation*

Having established an "injury-in-fact," Scenic America next must show that its injury is "fairly trace[able] to" the 2007 Guidance. Lujan, 504 U.S. at 560-61. Plaintiff describes the chain of causation as follows: Prior to the Guidance, most States did not allow digital billboards because they did not believe that the language of their FSAs or the decisionmakers at the FHWA would permit such proposals. After the Guidance, States may now successfully petition the FHWA to amend their regulations to allow the construction of such billboards because the agency has made clear its position that doing so does not violate their FSAs. See Opp. at 14. As a result, Scenic America now must expend more resources to combat the spread of digital billboards along the nation's highway system.

Of course, as this theory of the case makes clear, it is the States' decisions to amend their regulations to permit the construction of digital billboards that causes Scenic America's harm, not the 2007 Guidance that merely allowed them to do so. Although the burden is formidable, see Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ., 366 F.3d 930, 942 (D.C. Cir. 2004), a plaintiff may establish standing based on the actions of third parties, so long as there is "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation." Americans for Safe Access v. Drug Enforcement Admin., 706 F.3d 438, 446 (D.C. Cir. 2013). In this case, Scenic America has submitted documentary evidence indicating that, in 2006, the FHWA Division Office for Texas responded to an inquiry from the Texas Department of Transportation by explaining that the language of that state's FSA barred it from permitting the construction of digital billboards. See Opp., Exh. 13 (FHWA Texas Division Letter) at 2. Other evidence indicates that the FHWA Division Office for Kentucky took a similar position before the 2007 Guidance was issued. See Opp., Exh. 16 (FHWA Kentucky Division Email) at 3-4. After the Guidance, however, Texas and all the other States that did not permit digital billboards before 2007 no longer face this obstacle to permitting the construction of digital billboards in their territory. See, e.g., Lloyd Decl., ¶¶ 6-9 (explaining that Texas began to permit digital billboards along the interstate highway after the issuance of the 2007 Guidance). The harm that Scenic America suffers by having to expend more resources to fight against the spread of digital billboards is therefore "attributable to" the 2007 Guidance. Block v. Meese, 793 F.2d 1303, 1308 (D.C. Cir. 1986).

Defendants and Intervenor make three additional arguments as to why the Guidance is not the cause of Scenic America's injury, but all three fail to persuade. First, they note that some FHWA Division Offices approved state proposals to permit digital billboards before the issuance

of the 2007 Guidance.  Of course, that observation does not change the fact that other Division

Offices did not approve such proposals.  At least as to those Offices, the Guidance is the cause of

Scenic America's harm.

Second, they contend that the Guidance leaves Division Offices with the discretion to

reject States' proposals for allowing digital billboards.  The Guidance states that "[digital

billboards] are acceptable for conforming off-premise signs, if found to be consistent with the

FSA and with acceptable and approved State regulations, policies[,] and procedures."  2007

Guidance at 2 (emphasis added).  But that emphasis misses the entire point of the Guidance.

While Division Offices do retain discretion to reject States' digital-billboard proposals, the

Guidance also makes clear that digital billboards "do not violate a[n] [FSA] prohibition against

'intermittent' or 'flashing' or 'moving' lights," id. (emphasis added), meaning that Division

Offices, such as the one in Texas, are instructed not to reject proposals on that basis.  The

Guidance therefore unquestionably eases the path to approval for States' digital-billboard

proposals.

Finally, Defendants and Intervenor note that the HBA does not compel States to abide by

their FSAs, but merely imposes a 10% cut in federal highway funds if they disobey, see 23

U.S.C. § 131(b); 23 C.F.R. § 750.705(b), suggesting that there is no causal connection between

FHWA action and the existence of digital billboards.  Yet this understates the influence of

federal policy on the matter and overstates the requirements for standing.  No State has ever

dared violate its FSA, probably because the cut in federal highway funding would have a

significant effect.  Nor does the D.C. Circuit require that a challenged government policy compel

a third party to act in order to establish a causal relationship.  See National Parks Conservation

Ass'n v. Manson, 414 F.3d 1, 6 (D.C. Cir. 2005) (plaintiff had standing to challenge federal

agency's withdrawal of an adverse-impact letter, which led state agency to issue power plant permit, because "[h]ad [the federal agency] not withdrawn its adverse impact report, the [state agency] would have been bound to consider that report before proceeding with its permitting decision and, crucially, would have been required to justify its decision in writing if it disagreed with the federal report").  Here, "federal regulations and [state outdoor-advertising regulations] are intertwined such that the challenged federal action 'alters the legal regime to which the [local] agency action is subject.'"  Id. (quoting Bennett v. Spear, 520 U.S. 154, 169 (1997)) (second alteration in original).  That is enough to establish causation.

        3. *Redressability*

The last requirement for establishing standing to sue is that Scenic America must show that a favorable decision in this Court – namely, vacating the 2007 Guidance – would redress its injuries.  See Lujan, 504 U.S. at 560-61.  According to Scenic America, victory would force the FHWA to resurrect its pre-Guidance policy that digital billboards violate FSA prohibitions on flashing, intermittent, and moving lights.  At the very least, vacating the Guidance would return the FHWA to agnosticism on the question, leaving Division Offices free to draw their own conclusions.  As a result, Scenic America could "restore its broader scenic conservation platform" because it would not have to police as intensively new digital-billboard construction around the country.  Opp. at 23.

Defendants and Intervenor once again offer a triad of arguments why Scenic America's claimed injury is not redressable, but none proves convincing.  First, they again emphasize that some Division Offices approved States' digital-billboard proposals before the 2007 Guidance.  Again, however, other Division Offices did not, and so vacating the Guidance would at least affect those Offices.

Second, they note that the Guidance does not <u>require</u> Division Offices to approve State digital-billboard proposals, instead leaving them the discretion to give approval "based upon all relevant information."  2007 Guidance at 2.  Nevertheless, as explained earlier, the Guidance did remove one important basis on which a Division Office might otherwise reject a proposal: that it violated an FSA's ban on flashing, intermittent, or moving flights.  Restoring that basis – clearly the policy of at least the Texas Division Office prior to the issuance of the Guidance – would help relieve the burden on Scenic America in its fight against digital billboards.

Finally, Defendants and Intervenor claim that vacating the Guidance would not redress Scenic America's injury because existing digital billboards would likely remain standing and new digital billboards would continue to pop up along non-federal roads.  Be that as it may, Scenic America would still benefit from a win in this suit because the group would not have to fight against the erection of new billboards along interstate highways in States that have not yet approved their construction.

In sum, Scenic America has satisfied the minimum standing requirements of Article III by showing that the 2007 Guidance caused it to suffer an injury-in-fact that can be redressed by a favorable judgment in this lawsuit.  There is thus no jurisdictional bar to its prosecution of this lawsuit.  Yet Defendants and Intervenor have another arrow in their quiver: they assert that there is no final agency action for Plaintiff to challenge in this case.  That is the issue to which the Court will now turn.

B.  <u>Final Agency Action</u>

The APA provides a vehicle for plaintiffs to challenge "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Because the HBA only permits judicial review of FHWA decisions in specific

circumstances not present here, see 23 U.S.C. § 131(l) (permitting States to seek judicial review

of an FHWA order withholding federal highway funds), Scenic America may only challenge the

Guidance if it constitutes "final agency action."  Defendants and Intervenor argue that it does

not; if they are correct, the Court must dismiss the Complaint.  See, e.g., Holistic Candlers and

Consumers Ass'n v. FDA, 664 F.3d 940, 943 (D.C. Cir. 2012).

     The D.C. Circuit uses a two-part test to determine if agency action is final.  First, the

action must reflect the "consummation of the agency's decision-making process" rather than a

"tentative or interlocutory" step in that process, and second, the action must be one by which

"rights or obligations have been determined or from which legal consequences will flow."

Center for Auto Safety v. National Highway Traffic Safety Admin, 452 F.3d 798, 806 (D.C. Cir.

2006) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)) (internal quotation marks omitted).

The Court will address each part of the test in turn.

     It is clear that the 2007 Guidance reflects the "consummation of the [FHWA]'s decision-

making process" on the issue of whether digital billboards violate FSA prohibitions on

"flashing," "intermittent," or "moving" lights.  Id.  The Guidance states plainly, and in bold, that

"Proposed laws, regulations, and procedures that would allow permitting CEVMS subject to

acceptable criteria (as described below) do not violate a prohibition against 'intermittent' or

'flashing' or 'moving' lights."  2007 Guidance at 1-2 (emphasis added).  Nothing else in the

document suggests that the FHWA's conclusion on this point is "tentative, open to further

consideration, or conditional on future agency action."  City of Dania Beach, Fla. v. FAA, 485

F.3d 1181, 1188 (D.C. Cir. 2007).  Although the Guidance states that the FHWA "may provide

further guidance in the future as a result of additional information received through safety

research, stakeholder input, and other sources," 2007 Guidance at 1, it is clear that the agency

"has completed its decisionmaking process" as least as to whether digital billboards violate FSA light prohibitions.  Franklin v. Massachusetts, 505 U.S. 788, 797 (1992).  The fact that the Guidance "clarifies" an earlier memorandum from 1996 related to non-digital "tri-vision signs," 2007 Guidance at 1-2, and that it leaves to Division Offices the final decisions on particular State digital-billboard proposals, does not detract from the conclusiveness of the document's central premise.

Moving on to the second part of the inquiry, the D.C. Circuit has laid out a four-factor analysis to determine whether agency action has "legal consequences."  See Center for Auto Safety, 452 F.3d at 806-07.  Those four factors are: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; (3) whether the action has binding effects on the agency or has instead genuinely left the agency and its decisionmakers free to exercise discretion; and (4) whether the action imposed any rights or obligations or otherwise bound private parties.  Id.  These factors are not cumulative, and a case may turn on the analysis of just one factor.  See, e.g., National Resources Defense Council v. EPA, 643 F.3d 311, 319-20 (D.C. Cir. 2011).

The second and fourth factors are relatively straightforward in this case.  It is undisputed that the Guidance was not published in the Federal Register or Code of Federal Regulations and that it did not impose any legal rights or obligations on private parties.  The first factor is slightly more difficult.  The Guidance states that it is "not intended to amend applicable legal requirements," id. at 4, but this is "boilerplate" language that should not distract from the rest of the document.  Appalachian Power Co. v. EPA, 208 F.3d 1015, 1023 (D.C. Cir. 2000).  Elsewhere, the Guidance explains that it is intended to "provide information to assist the Division[] [Offices] in evaluating [digital-billboard] proposals and to achieve national

consistency given the variations in FSAs, State law, and State regulations, policies[,] and procedures." 2007 Guidance at 4. While the first part of that statement makes the Guidance seem purely informational, the latter reference to "achiev[ing] national consistency" suggests that the document is intended to have a coordinating effect on Division Office decisionmaking, as does its instruction that Offices "should re-evaluate their position" on digital billboards based on the contents of the memorandum. Id. at 1, 4. This factor thus ultimately tips in favor of Plaintiff.

The third factor – whether the Guidance has a binding effect on the agency – is the most complicated. Defendants and Intervenor emphasize that although the Guidance reflects the FHWA's perspective on the proper interpretation of certain FSA language, the final decisions on whether to approve particular digital-billboard proposals remain within the discretion of individual Division Offices. Prior to the Guidance, some Division Offices approved digital-billboard proposals while others did not, and after the Guidance, Offices remain free to either accept or reject States' digital-billboard proposals "based upon all relevant information." Id. at 2.

The circumstances of this case are almost identical to those in Natural Resources Defense Council, 643 F.3d 311. That case involved an EPA "Guidance" issued to the agency's Regional Air Division Directors, who were responsible for approving States' proposals for the implementation of certain federally mandated ozone regulations. See id. at 317. The document said that Directors should allow States the flexibility either to adopt the mandated ozone program or to propose an alternative program. See id.

The D.C. Circuit held that this EPA Guidance was final agency action. Although the EPA "insist[ed] that the Guidance changed nothing because prior to its issuance, a regional

director could have considered an alternative [program]," the panel was swayed by the fact that "that director [had] also retained discretion, now withdrawn … to reject the alternative solely for failing to comply with [the statute's mandated regulations]."  Id. at 319.  In other words, "[p]ost-Guidance … the director [could] no longer reject a plan on the … ground" that "alternatives were categorically unacceptable."  Id. at 320.  Because "[t]he permissibility of alternative[] [programs] is now a closed question," the panel concluded that "the Guidance binds EPA regional directors and thus qualifies as final agency action."  Id.

The 2007 Guidance works in much the same way.  Prior to its issuance, the FHWA's Division Offices, like the EPA's Regional Air Division Directors, "could have considered" the possibility that States' digital-billboard proposals did not violate FSA bans on moving, flashing, or intermittent lights.  Id. at 319.  Yet, again like the EPA's Division Directors, the Offices "also retained discretion, now withdrawn" to reject such proposals "solely" for violating those provisions.  Id.  Now that the 2007 Guidance has been issued, the Division Offices "may no longer reject" a State's digital-billboard proposal on the ground that digital billboards are "categorically unacceptable" under FSA moving, flashing, or intermittent light prohibitions.  Id. at 320.  The conclusion is inescapable that under the reasoning of Natural Resources Defense Council, the 2007 Guidance limits agency discretion and therefore has a binding effect that makes it final agency action.

Unhappy with this binding precedent, Defendants and Intervenor instead attempt to compare this situation to the one in Center for Auto Safety.  In that case, the D.C. Circuit held that a letter sent by the NHTSA to vehicle manufacturers outlining the circumstances under which the agency would approve a recall did not constitute final agency action because the letter merely expressed the agency's "view of what the law requires."  452 F.3d at 808 (internal

quotation marks omitted).  In the same way, according to Defendants and Intervenor, the 2007

Guidance simply reflects the FHWA's view on the meaning of particular FSA language and

leaves the actual decision making to individual Division Offices.

But that analogy expresses only half the story.  The 2007 Guidance does not just

announce the FHWA's vision of the law – that digital billboards are not "flashing,"

"intermittent," or "moving" lights; it also commands Division Offices to turn that vision into

reality.  While "NHTSA's position … [was] nothing more than a privileged viewpoint in the

legal debate," id., the 2007 Guidance ends any debate on whether the FSAs' dynamic-light

prohibitions bar digital billboards.  The importance of this distinction was made clear in <u>AT&T</u>

<u>Co. v. EEOC</u>, 270 F.3d 973 (D.C. Cir. 2001), a case relied on by <u>Center for Auto Safety</u>, which

involved the question of whether an EEOC letter stating that AT&T had violated anti-

discrimination law constituted final agency action.  <u>Id.</u> at 976.  The D.C. Circuit explained:

> [T]here are … particular circumstances in which an agency's
> taking a legal position itself inflicts injury or forces a party to
> change its behavior, such that taking that position may be deemed
> final agency action, <u>see</u> <u>Appalachian Power [Co. v. EPA</u>, 208 F.3d
> 1015, 1022 (D.C. Cir. 2000)] (holding that "a Guidance" issued by
> the Environmental Protection Agency is final because it represents
> a settled position that the agency "plans to follow in reviewing
> State-issued permits, a position it will insist State and local
> authorities comply with in setting the terms and conditions of
> permits issued to petitioners, [and] a position EPA officials in the
> field are bound to apply"), [but] this is not such a case.…<u>Whereas</u>
> <u>"EPA officials in the field [were] bound to apply" the EPA</u>
> <u>Guidance</u>, id., … the EEOC is not bound to sue AT&T.

<u>Id.</u> at 975-76 (emphasis added).  Similarly, while Division Offices are bound to apply the 2007

Guidance's interpretation of FSA language, the NHSTA was not bound to enforce recalls in

accordance with the "general" policy it expressed in its letter.  <u>Center for Auto Safety</u>, 452 F.3d

at 810.  The two documents therefore do not have equivalent legal effects.  <u>Natural Resources Defense Council</u>, not <u>Center for Auto Safety</u>, is the controlling case here.

In a final effort to derail the litigation, Defendants seize on the APA's limitation of judicial review to final agency action "for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  They argue that this language vitiates Scenic America's claim because state courts are available for the group to individually challenge each State's decision to permit digital billboards.  That interpretation of § 704, however, is contrary to the one adopted by the Supreme Court, which has explained that "adequate remedy" refers only to situations "where the Congress has provided special and adequate review procedures" – for instance, where "statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action."  <u>Bowen v. Massachusetts</u>, 487 U.S. 879, 903 (1988).  The Court has also emphasized that the provision "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  <u>Id.</u>  Under the Supreme Court's interpretation, therefore, state court proceedings would not qualify as an "adequate remedy" that deprives Scenic America of the right to challenge the Guidance in federal court.

The main case that Defendants have mustered in support of their reading of § 704 dealt with the very different scenario in which a plaintiff challenged a government agency's failure to enforce State compliance with federal law.  <u>See</u> Def. Reply at 17-20 (citing <u>Coker v. Sullivan</u>, 902 F.2d 84, 86-87 (D.C. Cir. 1990)).  There, the D.C. Circuit stressed that "the APA does not usually provide a right to judicial review of an agency's failure to enforce statutory provisions entrusted to agency supervision" and, in that unique context, observed, "[T]he APA specifically provides that, if other remedies are adequate, federal courts will not oversee the overseer."  <u>Id.</u> at 88-89 (citing <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985)).  The other cases Defendants cite

similarly involved federal agencies' failure to enforce antidiscrimination laws against third parties. See, e.g., Wash. Legal Foundation v. Alexander, 984 F.2d 483, 485 (D.C. Cir. 1993); Women's Equity Action League v. Cavazos, 906 F.2d 742, 751 (D.C. Cir. 1990); Council of and for the Blind of Delaware County Valley, Inc. v. Reagan, 709 F.2d 1521, 1531 (D.C. Cir. 1983); see also El Rio Santa Cruz Neighborhood Health Center, Inc. v. U.S. Dep't of Health and Human Services, 396 F.3d 1265, 1271 (D.C. Cir. 2005) ("[T]his court … [has] embraced the doctrinal view disfavoring suits directly against federal enforcement authorities administering anti-discrimination laws, holding that remedies against the discriminating entity were … adequate so as to preclude APA review."). Here, where Scenic America's challenge is not to the FHWA's failure to enforce the law but rather to its interpretation of the law, the Court believes it better to stick with the traditional "adequate remedy" inquiry by "focus[ing] on whether [the] statute provides an independent cause of action or an alternative review procedure." El Rio Santa Cruz, 396 F.3d at 1270. As Defendants do not allege that HBA provides either in this case, Scenic America may bring its claim under the APA.

IV.    **Conclusion**

For the foregoing reasons, the Court will deny Defendants' and Intervenor's Motions to Dismiss Plaintiff's Complaint. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: October 23, 2013