**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCENIC AMERICA, INC.,

    **Plaintiff,**

        **v.**                                    Civil Action No. 13-93 (JEB)

UNITED STATES DEPARTMENT OF
TRANSPORTATION, RAY LAHOOD,
FEDERAL HIGHWAY
ADMINISTRATION, and VICTOR
MENDEZ,

    **Defendants,**

    **and**

OUTDOOR ADVERTISING
ASSOCIATION OF AMERICA, INC.,

    **Intervenor-Defendant.**

<u>**MEMORANDUM OPINION**</u>

This administrative-law dispute involves a conundrum that has long bedeviled the federal

courts: How should rules written in the past apply to new and unforeseen circumstances in the

present?

The question arises, surprisingly enough, in the context of Interstate-Highway regulation.

Outdoor advertising on the Interstate is governed by the Highway Beautification Act of 1965, as

well as a number of regulations and federal-state agreements enacted in accordance with that

statute.  Many of those agreements have long banned billboards that use "flashing, intermittent,

or moving" lights.  Advertising science, however, has evolved since the <u>Mad Men</u> era of the

1960s; no longer content to simply mount Don Draper's slogans along the highway, advertisers

1

now want to reach their audiences via new, digital technology. The Federal Highway Administration, after thorough consideration, issued a Guidance memorandum in 2007 explaining that digital billboards – signs that use light-emitting diodes to display their messages – are not "flashing, intermittent, or moving" lights and thus do not fall within the ban of the old lighting standards.

Plaintiff Scenic America, a group dedicated to preserving the country's visual beauty, filed this suit claiming that FHWA's issuance of the Guidance substantively <u>changed</u> the lighting standards, thereby violating both the HBA and the Administrative Procedure Act. Defendants – the Department of Transportation, the Federal Highway Administration, the Secretary of Transportation, and the Federal Highway Administrator – and an Intervenor – the Outdoor Advertising Association of America – respond that the Guidance merely <u>interpreted</u> the ban on "flashing, intermittent, or moving" lights and thus violated no law. Both sides have now moved for summary judgment.

Although the Court does not pass judgment on whether digital billboards are a boon or a blight, sightly or unsightly, safe or unsafe, it does conclude that Defendants and Intervenor have the better of the argument here. The 2007 Guidance might not have offered the best interpretation of the lighting standards, but it did constitute an interpretation, rather than a substantive change. It was therefore issued lawfully.

## I.    Background

To understand the purpose and effect of the 2007 Guidance, the Court begins with its statutory backdrop – the Highway Beautification Act of 1965, 23 U.S.C. § 131 *et seq.* The HBA aims "to promote the safety and recreational value of public travel, and to preserve natural beauty" along the Interstate Highway System. <u>Id.</u>, § 131(a). The Act therefore directs each State

to negotiate a federal-state agreement (FSA) with the Secretary of Transportation that sets out rules for the "size, lighting[,] and spacing" of billboards that come within 660 feet of the Interstate. Id., § 131(d). All 50 States have entered such agreements, most of them written in the 1960s and 1970s. See AR 472-74.

The HBA next requires each State to "[d]evelop laws, regulations, and procedures" that implement the standards contained in its FSA. 23 C.F.R. § 750.705(h). All 50 States have done this as well. See, e.g., Ark. Code Ann. § 27-74-101 et seq. (The Arkansas Highway Beautification Act); Or. Rev. Stat. § 377.700 et seq. (The Oregon Motorist Information Act); Ariz. Rev. Stat. § 28-7901 et seq. (The Arizona Highway Beautification Act). Each State must obtain FHWA approval before making any changes to its outdoor-advertising regulations so that the agency may confirm that they continue to comply with that State's FSA. See 23 C.F.R. § 750.705(j). States that fail to ensure continuous compliance with their FSAs face a ten-percent cut in their annually allocated federal-highway funds. See id., § 750.705(h); 23 U.S.C. § 131(b).

In the decades since the FSAs were first drafted, however, new outdoor-advertising technology has emerged. See AR 149, 394-96. In the old days, advertisers used to manually mount their messages onto signboards using paint, glue-printed paper, and vinyl. See AR 149, 394. To change advertisements, workers had to climb up the signs and physically switch them, painting over the old "Coke" logo with an updated ad for "New Coke" (and then, a little later, a throwback promotion for "Coke Classic"). These days, however, businesses want to advertise on new, digital billboards – highway signs gilded with light-emitting diodes that serve as pixels making up a much larger image. See AR 339-340, 351, 396. LEDs offer a digital way to display static billboard advertisements and make changing them much easier, since the diodes can be reprogrammed remotely to cycle through multiple ads in a single day. See AR 149, 396. States

have thus sought to amend their outdoor-advertising regulations to allow for the erection of digital billboards along the Interstate Highway.

Not surprisingly, then, FHWA Division Offices began to receive State proposals to modify their regulations to permit these signs. Some proposals, however, seemed in tension with lighting provisions found in a majority of FSAs, which ban off-premise signs (signs that do not advertise activities conducted on the property on which they are located, see 23 U.S.C. § 131(c)(3); AR 150) that use "flashing, intermittent, or moving" lights. See, e.g., AR 519 (California FSA); AR 582 (Florida FSA); AR 620 (Illinois FSA); AR 653 (Kansas FSA); AR 709 (Massachusetts FSA); AR 811 (New Mexico FSA); AR 913 (South Carolina FSA).

The Division Offices initially took a variety of approaches to this issue. The Indiana Division, for example, saw no contradiction between digital billboards and its State's FSA, which, like many others, forbids off-premise signs with "flashing, intermittent, or moving" lights, AR 630, so long as each digital ad remained static for at least eight seconds and the transition period between ads took less than two seconds. See AR 325, 330-31. The New York Division, by contrast, concluded that digital billboards violated identical language found in the Empire State's FSA, see AR 823, unless they were limited to displaying only one message every 24 hours. See AR 320. The Texas Division went even further, warning that the exact same ban in the Texas FSA, see AR 962, "clearly prohibit[ed]" digital billboards in all circumstances. AR 128. The Mississippi Division, finally, thought the same lighting provision in the Magnolia State's FSA ambiguous, see AR 744, and, fearing inconsistency with the other Offices, contacted the agency's Associate Administrator in Washington, DC, in search of "an interpretation . . . at the national level." See AR 371. All in all, 22 FHWA Division Offices approved States' digital-billboard proposals as consistent with their FSAs. See AR 472-73.

Concerned by these varied readings, Congressman Brian Higgins of New York wrote the FHWA Administrator, inquiring about a uniform interpretation of the relevant FSA language as applied to digital billboards. <u>See</u> AR 292. FHWA pledged to canvass its Division Offices on the matter. <u>See</u> AR 293. The agency then mailed a survey to each Division Office, asking whether each Office's State had decided to permit digital billboards, if the State had justified that decision, if the Office had concurred with that justification, and if the State had regulations to govern the time that ads had to remain static or the transition time between ads. <u>See, e.g.,</u> AR 302-06. FHWA considered the results of this survey, <u>see</u> AR 471-74, as well as studies, AR 47-122, 134, 184, 195-284, 443-454, reports, AR 134-84, 191-94, 413-29, news articles, AR 287-89, 351, 365-66, 368-70, 409-12, 465-67, 469-70, and positions presented by outside groups, AR 338-50, 367-70, 388-400, 439-42, 458-64 – including Scenic America, <u>see</u> AR 338-350, 460-63 – in formulating the 2007 Guidance at issue here.

FHWA issued the Guidance, entitled "Guidance on Off-Premise Changeable Message Signs," to its Division Offices on September 25, 2007. AR 474. The document announces in bolded typeface: "Proposed laws, regulations, and procedures that would allow permitting [digital billboards] subject to acceptable criteria (as described below) do not violate a prohibition against 'intermittent' or 'flashing' or 'moving' lights as those terms are used in the various FSAs that have been entered into during the 1960s and 1970s." <u>Id.</u> It goes on to define the "acceptable criteria" that State proposals should contain, including regulations for the duration of the billboards' messages, the transition times between messages, the billboards' brightness, the spacing between the signs, and the locations of the signs. <u>See</u> AR 476-77.

The Guidance therefore instructs that Division Offices weighing State proposals to permit digital billboards within their borders should approve them so long as they (1) are otherwise

consistent with the State's FSA and (2) address certain public-safety concerns.  See AR 474.  It closes by noting that it is "intended to provide information to assist the Divisions in evaluating proposals and to achieve national consistency given the variations in FSAs, State law, and State regulations, policies, and procedures," and that it is "not intended to amend applicable legal requirements."  AR 477.

Scenic America subsequently filed this lawsuit alleging that the Guidance violated procedural and substantive provisions of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the HBA.  Defendants – the Department of Transportation, the Federal Highway Administration, the Secretary of Transportation, and the Federal Highway Administrator – along with an Intervenor – Outdoor Advertising Association of America – moved to dismiss Scenic America's Complaint for lack of standing and failure to state a claim.  The Court, in a written Opinion, found that Scenic America had standing to challenge the Guidance and that it had successfully stated a claim for relief under the APA.  See Scenic America v. Department of Transportation, 2013 WL 5745268 (D.D.C. Oct. 23, 2013).  It therefore denied those Motions, and the case proceeded to briefing on the merits.

As the parties have now cross-moved for summary judgment, the Court next turns to the substance of their arguments.

## II.    Legal Standard

Although all three parties have filed Motions for Summary Judgment, the limited role federal courts play in reviewing administrative decisions means that the typical Federal Rule 56 summary-judgment standard does not apply.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005)).  Instead, in APA cases, "the function of the district court is to

determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)). While the typical case proceeds as an "arbitrary and capricious" inquiry into agency action, 5 U.S.C. § 706(2)(A), the Court need not articulate that standard here, as Scenic America has not raised any challenge to the Guidance under that provision of the APA.

Scenic America has also filed a Motion to Supplement the Administrative Record, seeking to add seven documents to the materials before the Court. See Mot. to Supp. at 1-2. Defendants and Intervenor oppose this Motion on all but one document. See Opp. at 4. Because granting the Motion does not change the outcome of this case, the Court will do so and will consider the additional materials the group has offered. The Court will not consider, however, citations to materials outside the administrative record contained in any of the parties' pleadings. See Hill Dermaceuticals, Inc. v. FDA, 709 F.3d 44, 47 (D.C. Cir. 2013).

III. **Analysis**

Scenic America alleges three specific problems with the 2007 Guidance: First, it is a legislative rule promulgated without the notice-and-comment procedure required by the APA. See 5 U.S.C. § 533. Second, it creates a new lighting standard for billboards without "agreement between the several States and the Secretary [of Transportation]," as required by the HBA. See 23 U.S.C. § 131(d). And finally, it establishes lighting standards for billboards that are inconsistent with "customary use," another supposed violation of the HBA. See id. Because the

Court's resolution of the first point in favor of Defendants essentially resolves the second and third, it need only address Scenic America's APA argument in depth in order to decide this case.

A. Did 2007 Guidance Require Notice and Comment?

Scenic America says that FHWA issued the 2007 Guidance unlawfully because it failed to comply with the notice-and-comment procedures that agencies must follow when they promulgate new substantive rules. See 5 U.S.C. § 553(b) & (c). Indeed, the parties all agree that FHWA did not follow those procedures when it published the Guidance. Defendants and Intervenor contend, however, that the Guidance is not a substantive rule, but rather an "interpretative rule," which the APA expressly exempts from its notice-and-comment requirements. Id., § 553(b)(3)(A). It was therefore entirely appropriate, according to this argument, for FHWA to skip that step.

The Court begins with some basic definitions. A substantive rule is one "issued by an agency pursuant to statutory authority and which implement[s] the statute. . . . Such rules have the force and effect of law." Am. Min. Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1009 (D.C. Cir. 1993) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). An interpretative rule, by contrast, is one "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." Id. (quoting Attorney General's Manual 30 n.3). A substantive rule, in other words, creates new law, whereas an interpretative rule simply explains existing law.

On first impression, the 2007 Guidance seems more like an interpretative rule. The document instructs that certain FSA lighting provisions should not be read to ban digital billboards. According to the D.C. Circuit, "A statement seeking to interpret a statutory or regulatory term" – here, the terms "intermittent," "flashing," and "moving" – is "the

quintessential example of an interpretative rule." Orengo Caraballo v. Reich, 11 F.3d 186, 195 (D.C. Cir. 1993); see also Sentara-Hampton General Hosp. v. Sullivan, 980 F.2d 749, 759 (D.C. Cir. 1992) ("[T]he clarification of ambiguous terms . . . is precisely the type of agency action that the 'interpretative rule' exception was designed to accommodate[.]").  No party to this case disputes that agency interpretations of FSAs would be governed by this same rubric.  Game, set, match.

First impressions, however, can deceive.  A rule that superficially appears to interpret existing law may, on closer inspection, be discovered to have independent, substantive effect. See, e.g., Appalachian Power Co. v. EPA, 208 F.3d 1015, 1028 (D.C. Cir. 2000).  The Court of Appeals has thus devised a more refined approach to navigating the hazy boundary between substantive and interpretative rules, territory "enshrouded in considerable smog."  Am. Min. Cong., 995 F.2d at 1108 (quoting General Motors Corporation v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc)) (internal quotation marks omitted).   This Circuit uses a four-prong test to map the character of agency action, in which the fulfillment of any of the four prongs signals a substantive, rather than interpretative, rule.  See id. at 1112.  That test is laid out in further detail below.

The analysis does not end there, however.  Even if the four-part inquiry yields an interpretative rule, practical considerations may still render the agency's interpretation subject to the APA's notice-and-comment requirements.  Because substantive rulemaking, according to the APA, includes the modification as well as the creation of regulations, the Court of Appeals has instructed that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."  Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 586

(1997).  Under the so-called "Alaska Hunters doctrine," an agency must use notice-and-comment procedures to issue an interpretative rule when it "has given its regulation a definitive interpretation, and later significantly revises that interpretation," since in that circumstance it "has in effect amended its rule, something it may not accomplish without notice and comment." Alaska Professional Hunters Ass'n v. FAA, 177 F.3d 1030, 1034 (D.C. Cir. 1999).

To determine whether FHWA violated the law by issuing the Guidance without using notice-and-comment rulemaking, then, the Court will first apply the four-factor test set out in American Mining Congress to determine whether it is a substantive or interpretative rule.  Since the Court concludes under this test that the Guidance is interpretative, it will next apply the Alaska Hunters doctrine, asking whether the Guidance effects a significant revision to a prior, definitive interpretation.  The determination that it does not will bring this case to a close.

*1.  The Four-Part Substantive/Interpretative-Rule Inquiry*

As mentioned a moment ago, this Circuit uses a four-factor test to determine whether a rule is substantive or interpretative.  An affirmative answer to any one of these four factors renders the rule substantive.  See Am. Min. Cong., 995 F.2d at 1112.  Those factors are: (1) If in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) If the agency has published the rule in the Code of Federal Regulations, (3) If the agency has explicitly invoked its general legislative authority, and (4) If the rule effectively amends a prior substantive rule.  See id.  The Court will examine each in turn.

a.  Adequate Basis for Agency Action

To repeat, the first factor asks whether "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or

ensure the performance of duties."  Id. at 1109, 1112.  Put another way, this factor distinguishes

a rule that "itself carries the force and effect of law" – making it substantive – from one that

"spells out a duty fairly encompassed within the regulation that the interpretation purports to

construe" – making it interpretative.  Air Transport Assoc. of America v. FAA, 291 F.3d 49, 55-

56 (D.C. Cir. 2002).

     A real-world example or two will help to make this distinction more concrete.  The

classic instance in which the legislative basis for agency action would be inadequate without the

rule is where the relevant statute "forbids nothing except acts or omissions to be spelled out by

the" agency.  Am. Min. Cong., 995 F.2d at 1109.  Section 14(b) of the Securities Exchange Act,

for example, prohibits certain persons from giving or withholding a proxy "in contravention of

such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78n(b).  In that

circumstance, "clearly some agency creation of a duty is a necessary predicate to any

enforcement [action]."  Am. Min. Cong., 995 F.2d at 1109.   The creation of that duty would

therefore be a substantive, not an interpretative, rule.

     In the contrary case, where existing statutes or regulations themselves impose a

requirement, "there is no legislative gap" for the agency to fill with an additional, freestanding

rule.  Id. at 1112.  In American Mining Congress, for example, agency regulations already

required mine operators to report "diagnosed" occupational illnesses that occurred at their mines.

See id. at 1107.  The Mine Safety and Health Administration subsequently issued three letters

specifying what kinds of x-ray results qualified as "diagnoses."  See id. at 1108, 1112.  The D.C.

Circuit held that these letters were interpretative, not substantive.  Because the "regulations

themselves require the reporting of diagnoses of the specified diseases," MSHA already had an

adequate basis for enforcement without the letters, which merely explained what precisely constituted a "diagnosis." Id. at 1112.

Under this rubric, the 2007 Guidance is clearly an interpretative rule. As explained earlier, the HBA and its implementing regulations themselves authorize FHWA to review States' outdoor-advertising regulations and to dock their federal-highway funding by ten percent if they fail to ensure compliance with their FSAs. The majority of FSAs prohibit signs with "flashing, intermittent, or moving" lights. That regulatory scheme, then, on its own, already empowers the agency to either accept or reject State proposals to permit digital billboards, with or without the 2007 Guidance. In fact, as already discussed, several Division Offices did just that in the run up to the issuance of that document. All the Guidance does is spell out the meaning of one particular FSA provision in slightly greater detail. "Even if the [2007 Guidance] did not exist, the [FHWA] could rely upon prior authority" – the HBA, its implementing regulations, and the FSAs – to apply the policy embedded in that document. Truckers United for Safety v. FHWA, 139 F.3d 934, 939 (D.C. Cir. 1998). That makes it an interpretative, not a substantive, rule.

Scenic America's main counterargument is, essentially, a backdoor attack on the accuracy of the interpretation contained in the Guidance. According to the group, "The plain meaning of the common FSA lighting standards" – the ones prohibiting flashing, intermittent, or moving lights – "bans digital billboards. . . . The 2007 Guidance nonetheless supplies a new legislative basis for FHWA Division Offices to approve state digital billboards." Pl. Mot. at 30. The argument, in other words, is that the Guidance is substantive because the language it professed to interpret did not in fact permit digital billboards. FHWA Division Offices, accordingly, did not have the authority to approve such signs in the absence of the instruction in the Guidance. (Scenic America, it should be noted, has for some reason declined to offer this

argument as a more straightforward, frontal assault on FHWA's interpretation of the FSAs via section 706(2)(A) of APA's "arbitrary and capricious" standard of review. See, e.g., New York State Bar Ass'n v. FTC, 276 F. Supp. 2d 110, 140-41 (D.D.C. 2003).)

Plaintiff's argument appears to ignore clear D.C. Circuit precedent, which has affirmed, time and again, that "[a] statement which is interpretative does not become substantive simply because it arguably contradicts the statute it interprets." Cabais v. Egger, 690 F.2d 234, 238 (D.C. Cir. 1982); see also Am. Min. Cong., 995 F.2d at 1113; National Family Planning and Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 235 (D.C. Cir. 1992); Fertilizer Institute v. EPA, 935 F.2d 1303, 1308 (D.C. Cir. 1991). Still, the group's theory has a certain logic to it, since an agency that misreads a statute to give it authority that it does not actually possess would, technically, lack the legislative basis to act in the absence of that incorrect interpretation. The Court of Appeals, moreover, has cautioned that when an "interpretation runs 180 degrees counter to the plain meaning of the regulation[, it] gives us at least some cause to believe that the agency may be seeking to constructively amend the regulation." National Family Planning, 979 F.2d at 235. The Court, therefore, will examine whether the Guidance's interpretation "runs 180 degrees counter to the plain meaning of the" FSAs. Id. This standard of review is even more deferential than the one associated with Chevron USA v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984). Cf. Am. Min. Cong., 995 F.2d at 1110 ("[A]n interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty . . . will be interpretive, even if . . . it widens that duty even beyond the scope allowed to the agency under Chevron.").

The Court need not trace the etymology of each word in the FSA lighting provisions to conclude that the Guidance does not contradict them. FSAs, obviously, do not expressly forbid digital billboards, which did not exist when those agreements were drafted nearly half a century

ago.  Nor do they prohibit <u>all</u> lights.  Instead, they prohibit only "flashing, intermittent, or moving" lights.  That ban could be read, conceivably, to prohibit digital-billboard technology.  But it does not compel such a reading.  According to the 2007 Guidance, digital billboards are consistent with FSA lighting standards so long as they display each message for between four and ten seconds, transition between ads in between one and four seconds, and adjust brightness to changes in ambient light.  <u>See</u> AR 476.  The billboards approved by the Guidance thus could be understood neither to "flash," since the LEDs' brightness is limited and they must remain stationary for at least four seconds at a time, nor "move," since the images are static, in contrast to FHWA's previous instruction that a digital billboard displaying full-motion video <u>would</u> violate the FSAs' prohibition.  <u>See</u> AR 42.

It is a closer call as to whether these signs could be understood to use something other than "intermittent" light.  "Intermittent" means something "that intermits or ceases for a time; coming at intervals; operating by fits and starts," <u>Oxford English Dictionary</u>, www.oed.com (last visited June 20, 2014), or, alternatively, "starting, stopping, and starting again: not constant or steady," <u>Merriam-Webster</u>, www.merriam-webster.com (last visited June 20, 2014).  Again, because the LEDs are required to remain steady for several seconds at a time, the reading contained in the Guidance does not contradict the plain language of the FSAs.  In sum, the Guidance might not have adopted the best reading of the FSA lighting standards, but its interpretation is not "180 degrees counter" to those provisions.  <u>National Family Planning</u>, 979 F.2d at 235.  Indeed, the Guidance is not the first time FHWA officials have adopted such a reading – prior to the issuance of the Guidance, 22 FHWA Division Offices approved States' digital-billboard proposals as consistent with their FSAs.  <u>See</u> AR 472-73.

As a second counterargument, Scenic America claims that because this Court found, in its prior Opinion denying Defendants' and Intervenor's Motions to Dismiss, that the Guidance constituted "final agency action" for purposes of APA review, see Scenic America, 2013 WL 5745268, at *8-11, it is also bound to conclude that the Guidance forms the legislative basis for agency action, making it a substantive rule. The group cites two cases in support of that claim, but it misunderstands both of them. In fact, courts in this circuit have repeatedly found that rules can be both "final agency action" and "interpretative." See, e.g., Hall v. Sebelius, 689 F. Supp. 2d 10, 19-21 (D.D.C. 2009); Arizona v. Shalala, 121 F. Supp. 2d 40, 49, 52 (D.D.C. 2000).

First, the group invokes National Resources Defense Council v. EPA, 643 F.3d 311 (D.C. Cir. 2011). There, EPA issued a guidance document to its Regional Air Division Directors, instructing that they should allow States to propose alternatives to certain federally mandated ozone programs. See id. at 316-17. The Court of Appeals found that that guidance constituted final agency action because it "altered the legal regime [and] . . . b[ou]nd[] EPA regional directors." Id. at 320. The panel then noted that because "the Guidance document changed the law, the first merits question – whether the Guidance is a legislative rule that required notice and comment – is easy," answering in the affirmative. Id. Scenic America suggests that the 2007 Guidance similarly "changed the law" because, as the Court observed in its last decision, FHWA Division Offices previously retained discretion to reject digital-billboard proposals as violating the FSA lighting provisions and that the Guidance took away that discretion. See Scenic America, 2013 WL 5745268, at *10. According to Scenic America, this makes the Guidance a substantive rule.

Scenic America is mistaken. Natural Resources Defense Council said that the guidance document at issue there "changed the law" because "nothing in the statute, prior regulations, or

case law authorizes EPA to accept alternatives to" the mandated program. 643 F.3d at 321. The panel therefore concluded that "in the absence of the rule there would not be an adequate legislative basis for the agency" to do so – the first factor in the American Mining Congress analysis. Id. (quoting Am. Min. Cong., 995 F.2d at 1112. Here, by contrast, the HBA, its implementing regulations, and the FSAs, as interpreted by the 2007 Guidance, did give FHWA Division Offices legislative authority to approve States' digital-billboard proposals. Scenic America's insistence that FHWA was barred from doing so by the language of the FSAs simply reflects the group's preferred reading of those documents as banning, rather than permitting, digital billboards, and the Court has already held that such a reading is not the only possible one. The only "change in the law" that the 2007 Guidance affected was its removal of Division Offices' discretion to categorically reject States' digital-billboard proposals. "[R]estricting discretion," however, "tells one little about whether a rule is interpretive." Am. Min. Cong., 995 F.2d at 1111.

Second, Scenic America quotes National Mining Association v. Jackson, 880 F. Supp. 2d 119 (D.D.C. 2012), for the proposition that "the question of whether [a guidance document] amounts to final agency action . . . also necessarily decides the question of whether the [document] constitute[s] a de facto legislative rule." Id. at 132 n.10. This is simply a misrepresentation of that case. Although Scenic America suggests that the quote indicates a relationship between the final-agency-action inquiry and the substantive-versus-interpretative-rule inquiry, in fact, the quote from National Mining Association was actually relating the final-agency-action inquiry to the question of "whether a challenged action amounts to a rule or a mere statement of policy." Id. (emphasis added). That, obviously, is a different question from whether a rule is interpretative or substantive. See Am. Min. Cong., 995 F.2d at 1110 (observing

that "distinguishing policy statements, rather than interpretive rules, from legislative norms" is "a quite different context").

For its final counterargument, Scenic America cites <u>Cabais v. Egger</u>, 690 F.2d 234. There, the agency had taken a statue that was "very broad and . . . obviously intended to permit the states wide latitude," and issued an interpretation that "established detailed rules with mathematical formulae." <u>Id.</u> at 239. The panel held that the directive could not be considered an interpretative rule because it "limit[ed] state discretion . . . and impose[d] an obligation on the states not found in the statute itself." <u>Id.</u> Similarly, says Scenic America, "the 2007 Guidance introduces a detailed set of numerical parameters to govern the operation of digital billboards, completely untethered to any language in the statute or FSAs." Pl. Opp. at 11.

More recently, however, the Court of Appeals has made clear:

> While we have said that interpretive rules "cannot go beyond the text of a statute," we do not, of course, mean to imply that an interpretive statement may only paraphrase statutory or regulatory language. . . . [A]n interpretive statement may "suppl[y] crisper and more detailed lines than the authority being interpreted" without losing its exemption from notice and comment requirements.

<u>Orengo Caraballo v. Reich</u>, 11 F.3d 186, 195 (D.C. Cir. 1993) (citations omitted). Despite <u>Cabais</u>, then, the Circuit has been amenable to interpretative rules that derive highly specific, numerical interpretations from seemingly vague source material. Returning to <u>American Mining Congress</u>, for example, where a regulation required mine operators to report when occupational illnesses had been "diagnosed," the panel labeled "interpretative" an agency rule that expanded on the meaning of that regulation as follows:

> [A] chest x-ray rating above 1/0 on the [International Labor Office] scale constitute[s] a "diagnosis" of silicosis or some other pneumoconiosis. . . . [W]hen the first reader [of the x-ray] is not a "B" reader (*i.e.*, one certified by the National Institute of

> Occupational Safety and Health to perform ILO ratings), and the [mine] operator seeks a reading from a "B" reader, the [agency] will stay enforcement for failure to report the first reading. If the "B" reader concurs with the initial determination that the x-ray should be scored a 1/0 or higher, the mine operator must report the "diagnosis." If the "B" reader scores the x-ray below 1/0, the [agency] will continue to stay enforcement if the operator gets a third reading, again from a "B" reader; the [agency] then will accept the majority opinion of the three readers.

Am. Min. Cong., 995 F.2d at 1108. All that from a single word! Clearly, interpretative rules are not limited to "parroting the [source] rule or replacing the original vagueness with another." Id. at 1112. The specifications in the Guidance, moreover, are tied to the language in the FSAs because the limits on timing and brightness serve to ensure that the lights on the digital billboards do not "flash," "move," or shine "intermittently." According to this factor, then, the Guidance is an interpretative rule.

### b. Publication in Code of Federal Regulations

The second factor that distinguishes interpretative from substantive rules is "whether the agency has published the rule in the Code of Federal Regulations." Id. at 1112. As this Court noted in its last Opinion: "It is undisputed that the Guidance was not published in the Federal Register or the Code of Federal Regulations." Scenic America, 2013 WL 5745268, at *9. This is another signal that the Guidance is interpretative, not substantive.

### c. Invocation of General Legislative Authority

The third factor asks "whether the agency has explicitly invoked its general legislative authority" in promulgating the disputed rule. Am. Min. Cong., 995 F.2d at 1112.

It appears clear that FHWA did not explicitly invoke any such authority when it published the 2007 Guidance. The document states that its purpose is "to provide guidance" to Division Offices concerning digital billboards and to "clarif[y] the application" of an earlier

memorandum on the subject.  AR 474.  It emphasizes that it "is intended to provide information

to assist the Divisions in evaluating proposals and to achieve national consistency given the

variations in FSAs, State law, and State regulations, policies and procedures" and that "[i]t is not

intended to amend applicable legal requirements."  AR 477.  Nowhere in the Guidance does

FHWA invoke its general legislative rulemaking authority.  See 23 U.S.C. §§ 131 & 315.  Scenic

America nevertheless insists that the Guidance "does not interpret anything" but rather

"decrees," in a manner "consistent only with the invocation of its general rulemaking authority,"

that digital billboards do not violate the FSAs.  Pl. Reply at 11 (quoting Syncor International

Corporation v. Shalala, 127 F.3d 90, 95 (D.C. Cir. 1997)).  But the text of the Guidance speaks

for itself – it interprets FSA prohibitions on "flashing," "intermittent," or "moving" lights as

inapplicable to digital billboards, subject to certain criteria.  According to this factor, that makes

it an interpretative rule.

Scenic America also contends that the actual effect of the Guidance, not just what FHWA

says it is doing, should determine whether the agency has invoked its legislative authority.  In

support, the group cites National Family Planning and Reproductive Health Ass'n v. Sullivan,

979 F.2d 227 (D.C. Cir. 1992), where the Court of Appeals held that "post hoc characterizations

of . . . rules as interpretive by [agency] counsel are of no avail . . . .  '[T]he label that the

particular agency puts upon its given exercise of administrative power is not, for our purposes,

conclusive; rather it is what the agency does in fact.'"  Id. at 237-38 (quoting Lewis-Mota v.

Secretary of Labor, 469 F.2d 478, 481-82 (2d Cir. 1972)).  That sentiment, however, is in tension

with the articulation of this factor in American Mining Congress, which asks whether the agency

"explicitly invoked" its general legislative power.  Am. Min. Cong., 995 F.2d at 1112 (emphasis

added).  As American Mining Congress is the case that fully articulates the four-factor analysis,

the Court will follow its version of the inquiry. Even if National Family Planning carried the day, moreover, the characterization of the 2007 Guidance as interpretative is not a *post hoc* justification offered by FHWA counsel, but instead is evident in the text of the document itself.

Otherwise, all Scenic America can muster is two quotes stating that an agency cannot make a rule "interpretative" simply by labeling it so. See Pl. Reply at 11-12 (quoting Appalachian Power Co. v. EPA, 208 F.3d 1015, 1024 (D.C. Cir. 2000), and United States Telecom Ass'n v. FCC, 400 F.3d 29, 35 (D.C. Cir. 2005)). But neither quotation comes from a discussion of the "general legislative authority" inquiry at issue here. Instead, both refer more broadly to the substantive/interpretative-rule distinction as well as to the utility of the four-factor analysis, into the weeds of which the Court has now fully sunk. They do not change the outcome. This factor, in sum, indicates that the Guidance is an interpretative rule, not a substantive one.

### d. Effective Amendment of a Prior Substantive Rule

The fourth and final factor asks whether the disputed rule "effectively amends a prior [substantive] rule." See Am. Min. Cong., 995 F.2d at 1112. "Effective amendment" requires that the new rule "repudiate[]" or be "irreconcilable" with an existing substantive rule – "[a] rule does not, in this inquiry, become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." Id. at 1112-13.

According to Scenic America, the Guidance effectively amended FSA lighting provisions that forbid "flashing, intermittent, or moving" lights by interpreting them to permit digital billboards. Defendants and Intervenor express skepticism that FSAs are properly considered "substantive rules," but the Court need not decide that question because, even if they are, the 2007 Guidance does not effectively amend them. As the Court has already explained, see

Section III.A.1.a, *supra*, the interpretation contained in the Guidance may not be the best reading of the FSAs, but it does not repudiate them, nor is it irreconcilable with them. According to this factor, then, the Guidance is an interpretative rule.

The two cases Scenic America cites in support of its position, ironically, instead serve to illustrate the relative compatibility between the Guidance and the FSAs. In United States Telecom Association v. FCC, 400 F.3d 29, the FCC had previously adopted a substantive rule requiring telephone companies to ensure that telephone users could keep their phone numbers when they switched from one company to another, but only if they remained at the same physical location. See id. at 35. The FCC then issued a new rule requiring telephone companies to allow users to keep their existing numbers "regardless of physical location . . . notwithstanding the [prior rule's] declaration that such location portability would not be mandated." Id. The D.C. Circuit held that the latter rule contradicted the first, making it substantive. See id. at 35-36. Similarly, in National Family Planning and Reproductive Health Association v. Sullivan, 979 F.2d 227, a substantive rule stated that projects receiving Title X funding "may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." Id. at 234. The agency then issued a new rule, stating that Title X physicians "may, pursuant to the same regulations, provide counseling and referrals for abortions when their medical judgment so dictates." Id. at 234-35. Once again, the latter rule contradicted the first, making it substantive. See id. at 235. Neither of these two scenarios comes close to the situation here, where FHWA has adopted a reading of the FSA lighting provisions that may not be perfect, but nevertheless does not stand in complete contradiction to them.

For those still counting at home, all four factors of the <u>American Mining Congress</u> indicate that the 2007 Guidance is an interpretative rule, not a substantive one. According to the text of the APA, then, it need not have been published via notice and comment.

### 2. *Alaska Hunters* Doctrine

Although the Court has found that the 2007 Guidance is an interpretative rule, it may nevertheless be subject to the APA's notice-and-comment requirements under the <u>Alaska Hunters</u> doctrine. According to that doctrine, an agency must still use notice-and-comment procedures to issue an interpretative rule when that rule "significantly revises" a prior "definitive interpretation," since that "in effect amend[s] [the agency's prior] rule, something it may not accomplish without notice and comment." <u>Alaska Professional Hunters</u>, 177 F.3d at 1034. An interpretative rule is considered to "significantly revise" a previous definitive interpretation if it cannot "reasonably be interpreted as consistent" with that prior reading. <u>MetWest v. Secretary of Labor</u>, 560 F.3d 506, 510 (D.C. Cir. 2009) (internal quotation marks and citation omitted).

The <u>Alaska Hunters</u> case provides an excellent example of this doctrine in action. There, the Federal Aviation Administration's Alaskan Region had uniformly advised for almost thirty years that, under its interpretation of the law, Alaskan hunting and fishing guides who piloted light aircraft did not need to comply with certain commercial-pilot regulations. <u>See Alaska Professional Hunters</u>, 177 F.3d at 1030, 1035. Suddenly, however, the agency changed course, publishing a notice that the Alaskan guides would in fact have to abide by those regulations. <u>See id.</u> at 1030. On appeal, the D.C. Circuit ruled against the FAA:

> "Rule making," as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule. When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment.

Id. at 1034 (citation omitted). Because FAA's prior position had become "an authoritative departmental interpretation, an administrative common law," id. at 1035, the agency could only revise that interpretation via notice-and-comment rulemaking.

As an initial matter, Intervenor suggests that the Alaska Hunters doctrine does not apply to this case, questioning "whether FHWA could unilaterally issue a 'definitive' interpretation of a federal-state agreement, given that those agreements are contracts negotiated between two parties – the federal government and the relevant State." Int. Mot. at 22. Defendants suggest an even more radical approach, arguing that the doctrine itself "is contrary to the APA's express exemption of interpretive rules from the notice-and-comment requirement . . . as well as the 'basic tenet of administrative law' that the APA 'established the maximum procedural requirements impose[d] upon agencies in conducting rulemaking procedures.'" Def. Opp. at 15 n.2 (quoting Vermont Nuclear Power Corp. v. NRDC, 435 U.S. 519, 524, 544 (1978)). Indeed, the Supreme Court has recently granted certiorari to consider that very question. See Mortgage Bankers Ass'n v. Harris, 720 F.3d 966 (D.C. Cir. 2013), cert. granted sub nom., Nichols v. Mortgage Bankers Ass'n, 82 U.S.L.W. 3533 (U.S. June 16, 2014) (No. 13-1052). The Court need not explore either path, however, as even assuming the applicability and the validity of the Alaska Hunters doctrine, FHWA need not have used notice-and-comment rulemaking to issue the 2007 Guidance.

According to Scenic America, the Guidance significantly revised FHWA's position, going back almost 40 years, that "signs displaying static messages through the use of variable lighting" violate the FSA lighting standards at issue in this case. Pl. Mot. at 36. Defendants and Intervenor, by contrast, contend that the Guidance is consistent with the most recent authoritative statement from the agency on the issue – a memorandum issued in 1996. The Court, therefore,

must first determine precisely what FHWA's prior position was on the issue of digital billboards – or if such a position existed – before it can decide whether the 2007 Guidance significantly revised that position.

As far back as 1978, it appears that, for purposes of highway regulations promulgated under the 1958 Bonus Act, <u>see</u> 23 C.F.R. § 750.108(c), FHWA "characterized as a flashing light electronic information displays which neither flash nor animate static information, but where the only movement is the periodic changing of information against a solid, colorless background." H.R. Rep. 95-1485, 17 (Conf. Rep.), <u>as reprinted in</u> 1978 U.S.C.C.A.N. 6575, 6593. More recently, in 1990, FHWA issued a memorandum to its Regional Administrators on the subject of "commercial electronic variable message signs (CEVMS) which change their advertising messages by electronic process or remote control . . . [and] use various types of evolving technology such as lights, glow cubes, rotating slats, moving reflective disks, etc." AR 1. Referring to the FSAs negotiated under the Highway Beautification Act, the 1990 memorandum made clear that "FHWA has interpreted the Federal law as implemented under individual State/Federal agreements to prohibit off-premise variable message signs, irrespective of the method used to display the changing message. The prohibited CEVMS must be considered to be illegal signs." <u>Id.</u>

FHWA's next statement on the matter came with its issuance of a 1996 memorandum, entitled "INFORMATION: Off-Premise Changeable Message Signs." AR 30. That memorandum observed that a number of States had taken the position "that certain off-premise changeable message signs are consistent with State law and do not violate the lighting provisions of their State/Federal agreement" and that "[b]ecause of the increased use of changeable message

signs, we believe it is timely to restate our position concerning these signs." AR 30. It then opined:

> In the twenty-odd years since the [FSAs] have been signed, there have been many technological changes in signs, including changes that were unforeseen at the time the agreements were executed. While most of the agreements have not changed, the changes in technology require the State and FHWA to interpret the agreements with those changes in mind.

Id. The document therefore instructed that "[c]hangeable message signs are acceptable for off-premise signs, regardless of the type of technology used, if the interpretation of the State/Federal agreement allows such signs. In nearly all States, these signs may still not contain flashing, intermittent, or moving lights." Id.

Two more data points are available, but neither offers much meat for purposes of this analysis. First, the various Division Office approvals and disapprovals of States' digital-billboard proposals add some flavor to FHWA's developing position on the issue, but, as both Defendants and Scenic America agree, "individual Division interpretations do not constitute authoritative or definitive interpretations for purposes of the Alaska Hunters doctrine[.]" Def. Mot. at 26; see also Pl. Mot. at 37. Second, as of 2007, FHWA's website apparently included a subsection entitled "A History and Overview of the Federal Outdoor Advertising Control Program," which stated that "[o]ff-premise message center type signs using internal lighting are not yet approved for general off-premise application." AR 342. But, as Scenic America seems to concede, this blurb can hardly be said to offer a "definitive interpretation" that binds the agency as a whole. Alaska Professional Hunters, 177 F.3d at 1034; see also Pl. Opp. at 16.

To the extent that the Court can discern from this meager record a position on signs displaying static messages through variable lighting, then, it appears that the 1996 memorandum – which has not been challenged here – reversed the 1990 memorandum by guardedly approving

such technology.  Scenic America attempts to reconcile the two entries, contending that the 1996 memo discussed only "tri-vision billboards, signs that employ rotating panels, not lighting, to effect message changes."  Pl. Mot. at 36-37.  But the documents speak for themselves.  The 1990 memo states that FSAs "<u>prohibit</u> off-premise variable message signs, <u>irrespective of the method used</u> to display the changing message."  AR 1 (emphasis added).  The 1996 memo, by contrast, says that "[c]hangeable message signs are <u>acceptable</u> for off-premise signs, <u>regardless of the type of technology</u> used."  AR 30 (emphasis added).  The 1996 memo, in short, approves changeable-message signs "regardless of the type of technology used" so long as the applicable FSA allows such signs.  AR 30.  This policy necessarily supersedes the contrary one articulated in the 1990 memo.

Having determined that the 1996 memo is the most recent statement of FHWA's position on the matter, the Court must now determine whether the 2007 Guidance "significantly revises" that stance.  <u>Alaska Professional Hunters</u>, 177 F.3d at 1034.  It is clear that it does not.  The 1996 memo permits changeable message signs "regardless of the type of technology used," so long as those signs are consistent with the applicable FSAs, including provisions banning "flashing, intermittent, or moving lights."  AR 30.  The 2007 Guidance, in harmony with that framework, approves "[c]hangeable message signs, including Digital/LED Display CEVMS . . . if found to be consistent with the FSA," and explains that digital billboards, so long as they are subject to certain "acceptable criteria," do not constitute "flashing, intermittent, or moving lights."  AR 474-75.  The Guidance is therefore simpatico with the agencies' prior position on the matter.

Because the 2007 Guidance does not significantly revise FHWA's prior interpretation of the FSA lighting provisions, the <u>Alaska Hunters</u> doctrine does not apply, and the agency need not have promulgated the document via notice-and-comment rulemaking.

B.  Scenic America's Remaining Two Counts

Scenic America's final two challenges to the Guidance are both resolved by the Court's conclusion that the document is an interpretative rule that construes, rather than contradicts, the existing FSA lighting standards.

*1.  Creation of New Lighting Standards*

In its second count, Scenic America alleges that the 2007 Guidance violates the law because it "creates new lighting standards," Pl. Mot. at 38, without "agreement between the several States and the Secretary [of Transportation]," as required by the HBA.  See 23 U.S.C. § 131(d).  If FHWA wanted to approve digital billboards, says the group, it should have worked with each State to amend its FSA in order permit such signs.

Scenic America's argument on this point presumes, wrongly, that the Guidance does something more than interpret existing FSA lighting provisions: "The 2007 Guidance . . . violates the procedural requirements of the HBA.  It directs FHWA Division Offices to approve digital billboards despite many FSAs' more restrictive standards banning flashing, intermittent, or moving lights.  This, in turn, enables states to bypass the FSA amendment process."  Pl. Mot. at 39.  As the Court has already explained, however, the Guidance merely <u>interprets</u> the lighting standards already specified in the FSAs; it does not create new ones.  Scenic America has declined to bring an independent challenge to the validity of that interpretation, and, moreover, the group appears not to contest that a loss on its first count also translates into a loss on its second.   On this point, too, the Court rules for Defendants and Intervenor.

*2.  Standards Inconsistent with Customary Use*

For its final challenge to the Guidance, Scenic America alleges that the document unlawfully establishes lighting standards for billboards that are inconsistent with "customary

use," another purported requirement of the HBA. See id. at 41. The relevant statutory language reads as follows:

> In order to promote the reasonable, orderly, and effective display of outdoor advertising while remaining consistent with the purposes of this section, signs, displays and devices whose size, lighting, and spacing, consistent with customary use is to be determined by agreement between the several States and the Secretary [of Transportation], may be erected and maintained within six hundred and sixty feet of the nearest edge of the right-of-way within areas adjacent to the Interstate.

23 U.S.C. § 131(d).

As both Defendants and Scenic America note, this section of the HBA is what spawned the FSAs – it instructs the States and the Department of Transportation to negotiate "agreement[s]" to govern outdoor advertising along the Interstate Highway. Id. Each agreement must set out outdoor-advertising rules that govern "size, lighting, and spacing, consistent with customary use." Id. (emphasis added). The "customary use" requirement, therefore, refers to the content of the FSAs, including their lighting standards. Both Defendants and Scenic America recognize, accordingly, that "all FSA lighting provisions were established 'consistent with customary use.'" Pl. Opp. at 24 (internal quotation marks omitted); see also Def. Opp. at 22. Since the Court has previously found that the 2007 Guidance merely interprets those provisions, it is inescapable that the document is similarly consistent with customary use. Scenic America's own pleading makes clear that its argument once again depends on the premise, already rejected by this Court, that the Guidance does something other than interpret the FSAs: "[A]ll FSA lighting provisions were established 'consistent with customary use.' The 2007 Guidance does not interpret those provisions, but rather adds an exemption to them, and thereby allows an inconsistency between some states' size, lighting, and spacing restrictions and their customary use of outdoor advertising." Pl. Opp. at 24 (emphasis added) (internal quotation marks omitted).

Because the Court has already decided otherwise, Scenic America's argument on this point must fail as well.

## IV.      Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant in full Defendants' and Intervenor's Motions for Summary Judgment and deny Scenic America's.  The Court will dismiss with prejudice all three of Scenic America's challenges to the 2007 Guidance.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 20, 2014